## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  10-_____** |
| **v.** | : | **DATE FILED: 11-18-2010____** |
| **JOSEPH M. BRAAS** | : | **VIOLATIONS:** |
| **MICHAEL J. SCHLAGER** | | **18 U.S.C. § 371 (conspiracy - 1 count)** |
| **MARY C. STANKIEWICZ,** | : | **18 U.S.C. § 1341 (mail fraud - 8 counts)** |
| **formerly "Mary C. Musser,"** | | **18 U.S.C. § 1956(h) (conspiracy to commit** |
| **MISTY L. KROESEN,** | : | **money laundering - 1 count)** |
| **formerly "Misty L. May,"** | | **18 U.S.C. § 1957 (money laundering - 5** |
| **CURTIS A. KROESEN** | : | **counts)** |
| **JOHN WILEY SPANN,** | | **18 U.S.C. § 2 (aiding and abetting)** |
| **a/k/a "Wiley Spann,"** | : | **Notice of forfeiture** |
| **HAROLD W. YOUNG** | | |
| **JOHN S. TOMBERLIN** | : | |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

1.      Equipment Finance, LLC, ("EFI") was a logging industry lender based in

Lititz, Pennsylvania, that provided financing for the purchase of forestry and land clearing

equipment, primarily in the southeastern United States.  EFI, which was acquired by Sterling

Financial Corporation in March 2002, was a wholly owned subsidiary of the Bank of Lancaster

County, N.A.  From the time it was acquired by Sterling Financial Corporation until April 2007,

the value of EFI's loan portfolio grew on paper from approximately $80 million to approximately

$330 million.

2.      Sterling Financial Corporation ("Sterling") was a diversified financial

services company headquartered in Lancaster, Pennsylvania.  Through its affiliates and

subsidiaries, Sterling provided financial services such as specialty commercial financing, fleet and equipment leasing, and investment, trust, and brokerage services for corporate and individual clients.  Sterling was a publically held company whose shares of stock were publically traded on the NASDAQ stock exchange.  Toward the end of the fraudulent scheme charged here, EFI's purported net income accounted for approximately 30% of Sterling's purported net income.

3.     Bank of Lancaster County, N.A. ("BLC"), a wholly-owned subsidiary of Sterling that was headquartered in Strasburg, Pennsylvania, was a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation.

4.     Ernst & Young, LLP ("E&Y") was Sterling's outside auditor and performed annual audits of Sterling, which included a review of EFI's books and records.

5.     Accume Partners was Sterling's internal auditor and performed routine reviews of EFI's books and records.

6.     Defendant JOSEPH M. BRAAS was a Senior Vice President of EFI and its Chief Operating Officer.  Defendant BRAAS was responsible for running EFI from day-to-day.  He also initiated and serviced loans and had responsibility for reviewing and approving loans initiated by others at EFI.

7.     Defendant MICHAEL J. SCHLAGER was a Senior Vice President and the Recovery/Workout and Repossessed Equipment Manager of EFI.  Defendant Schlager was responsible for handling EFI repossessions, and he initiated and serviced loans.

8.     Defendant MARY C. STANKIEWICZ was Secretary/Treasurer of EFI and head of the accounting department.  As part of her duties, she had check signing authority, prepared monthly financial statements, and supervised those in the accounting department who

2

were responsible for entering loan payment information and new loan information into EFI's computer system, including defendant MISTY L. KROESEN.

9.     Defendant MISTY L. KROESEN was an employee in EFI's accounting department.  She was responsible for entering loan payment information and new loan information into EFI's computer system, generating proceeds checks for new loans, maintaining accounts payable and accounts receivable, and verifying customers' insurance.

10.     Defendant CURTIS A. KROESEN was an Account Executive at EFI and was responsible for originating and servicing loans, including completing the required paperwork to initiate loans.

11.     Defendant JOHN WILEY SPANN was a logging equipment dealer based in Andalusia, Alabama, and the surrounding area, who obtained numerous loans from EFI through defendant MICHAEL J. SCHLAGER, and who recruited other borrowers for loans from EFI.

12.     South Central Agency ("SCA") was a business located in Andalusia, Alabama, that specialized in insurance, mortgages, and real estate, and was listed as the purported insurer of equipment that secured numerous EFI loans.

13.     Defendant HAROLD W. YOUNG was President of SCA.

14.     Defendant JOHN S. TOMBERLIN was a business partner of defendant HAROLD W. YOUNG and also worked at SCA.

**EFI's Operations**

EFI Loans: Requirements, Approval Process, Record Keeping, and Customer Payments

15.     EFI provided loans for new or late model logging equipment, and those loans were typically secured by the equipment being purchased.  EFI required borrowers to make a down payment of 20% of the equipment purchase price or to pledge collateral worth approximately the same amount in order to protect EFI's interest in the event that the loan went into default.  EFI's equity in the equipment would then be large enough to recoup what it paid out when the loan was funded, as well as any costs associated with repossession and resale.  EFI perfected its security interest in the logging equipment by filing the appropriate Uniform Commercial Code paperwork.

16.     EFI required borrowers to have insurance on all equipment for which it provided financing.  In most instances, customers escrowed their insurance premiums at EFI, and these funds were booked to what was known at EFI as Account 216.  Usually, a portion of the initial loan proceeds and a portion of each borrower payment was escrowed in Account 216.  The insurance companies billed EFI, and EFI paid the premiums from Account 216 on behalf of the borrowers.

17.     Borrowers were permitted to have multiple EFI loans, but if any client went over the $500,000 maximum aggregate loan total, it triggered a duty to report to the Managers of EFI.

18.     Ordinarily, EFI loans were initiated after an equipment purchaser and dealer negotiated a price for a piece or pieces of logging equipment, and the purchaser applied to EFI for funding.  EFI would assign an Account Executive, or loan officer, to the deal, and that

4

person would check the borrower's credit and the down payment or collateral being pledged to secure the loan.  The Account Executive made a recommendation on whether to approve the deal, but did not have authority to initiate a loan on his or her own.  Loans had to be approved by a vice president or higher.

19.     Once a loan was approved, the EFI Account Executive created a "credit file."  The credit file was to contain numerous items, including the following: EFI credit application; the borrower's personal information, such as name, date of birth, social security number or employer identification number, telephone number, and mailing address; a description of the equipment purchased, including serial numbers; credit reports; credit references; payment totals associated with the contract; documentation of the down payment; insurance verification statement; the security agreement and documentation of Uniform Commercial Code filings; and the promissory note.

20.     The Account Executive then created a "follow-up file," which was maintained by the assigned Account Executive and was to contain his or her notes as well as information about all borrower payments.

21.     A package of loan paperwork, which included the EFI loan contract, was sent to the equipment dealer for review and signatures.  After the package was returned to EFI and reviewed for accuracy and completeness, copies of the finalized loan contract were mailed to the dealer and the borrower.

22.     An employee in the accounting department issued the proceeds check for the balance owed on the equipment to the dealer and ordered a payment coupon book for the borrower, to assist with bookkeeping when payments were made.

23. Borrowers primarily made their loan payments in one of two ways: by mailing a check to EFI, or using what was known as a "check-by-phone." When borrowers mailed their checks to EFI, the checks were forwarded to the assigned Account Executive so that he or she could document the payment in the follow-up file. If the borrower did not include a payment coupon specifying the loan to which the payment was to be applied, the Account Executive prepared the appropriate coupon. The Account Executive then forwarded the checks and payment coupons to the accounting department. There, a deposit slip was prepared, the payment information was entered in the computer system, and then defendant MARY C. STANKIEWICZ took the checks and deposit slips to the bank.

24. The "check-by-phone" procedure allowed a borrower to make a payment over the telephone. An employee in the accounting department typically took the payment information from the borrower over the phone, input the information in EFI's computer system, and then printed out a check. The accounting department employee then forwarded that check to the assigned Account Executive, who noted the payment in the appropriate follow-up file and then returned it to the accounting department for deposit.

Options for Borrowers Who Did Not Make Payments: Deferrals, Resets, and Repossessions

25. If a borrower missed a payment on an EFI loan, defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER had the authority to make a "deferral" on the loan. All deferrals were supposed to be requested by the borrower. If a deferral was granted, the missed payment was added to the last scheduled payment, along with a deferral fee, so that there was a "balloon" payment at the end of the life of the loan. A deferral would prevent the loan from having to be listed as delinquent in EFI's books and records.

6

26.     If a borrower missed payments on a loan, defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER had authority to "reset" the loan.  A reset was essentially a refinance or renegotiation of the terms of the loan that could extend the length of the contract and adjust the interest rate.  EFI typically charged a reset fee.  A reset would prevent the loan from having to be listed as delinquent in EFI's books and records.

27.     If a borrower missed payments on a loan, EFI could also resort to repossessing the equipment that secured the loan.  Both defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER had authority to authorize repossessions.  Once the equipment was repossessed, EFI attempted to resell the equipment to avoid any losses.

<u>Audits by Accume Partners and E&Y</u>

28.     As part of its audits of Sterling, Accume Partners performed routine quarterly reviews of EFI during which the auditors would review a sample of new loan files that were initiated within the last 90 days.

29.     E&Y performed annual reviews of EFI's books and records as part of its audits of Sterling.  During these reviews, E&Y employees examined numerous EFI loan files.  Additionally, and in order to check the accuracy of EFI's records, E&Y had "confirmation letters" mailed to EFI borrowers.  The confirmation letters asked borrowers to review information from EFI's files about the borrowers' loans, provide their signatures to show they had reviewed the information for accuracy, and mail the forms back to E&Y.

<u>Reporting to EFI's Board, Sterling, and BLC</u>

30.     On a monthly basis, defendant JOSEPH M. BRAAS provided the following financial reports to EFI's Board, which shared them with Sterling's management:

7

EFI's balance sheet, income statement, analysis of the aging report, report of new business, and workout recovery report. On a quarterly basis, defendants BRAAS and MICHAEL J. SCHLAGER provided the following reports to EFI's Board, BLC, and Sterling executives: profit/loss statements, reports summarizing new business generated, and results of collection efforts on past due accounts. These reports included information about EFI's new loans, delinquent accounts, and repossessions.

### Compensation

31.     Defendants JOSEPH M. BRAAS, MICHAEL J. SCHLAGER, MARY C. STANKIEWICZ, MISTY L. KROESEN, and CURTIS A. KROESEN received annual bonuses and salary increases. The size of the bonus pool was reviewed by Sterling's Compensation Committee for appropriateness based on EFI's growth and performance as it was represented in EFI's reports.

### Funding

32.     EFI funded its operations in a number of ways, including payments from borrowers, sale of loans to third parties, and lines of credit. BLC was EFI's largest creditor. As of April 2007, at the time the fraud was reported to Sterling, EFI had outstanding loans from BLC totaling approximately $200 million. All loans from BLC were secured by EFI's loans. EFI also had approximately $40 million in loan files that it had sold to third parties that EFI continued to service.

**The Conspiracy**

33.     From at least in or about January 2001, to in or about April 2007, in

Lancaster County, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOSEPH M. BRAAS**
**MICHAEL J. SCHLAGER**
**MARY C. STANKIEWICZ**
**MISTY L. KROESEN**
**CURTIS A. KROESEN**
**JOHN WILEY SPANN**
**HAROLD W. YOUNG, and**
**JOHN S. TOMBERLIN**

conspired and agreed, together and with others known and unknown to the grand jury, to commit

an offense against the United States, that is, to knowingly devise a scheme to defraud EFI and

others, and to knowingly obtain money and property from EFI and others by means of false and

fraudulent pretenses, representations, and promises, and to use the United States mails and

commercial interstate carriers to further the scheme to defraud, in violation of Title 18, United

States Code, Sections 1341.

**MANNER AND MEANS**

It was part of the conspiracy that:

34.     Defendants JOSEPH M. BRAAS, MICHAEL J. SCHLAGER, MARY C.

STANKIEWICZ, MISTY L. KROESEN, CURTIS A. KROESEN, JOHN WILEY SPANN,

HAROLD W. YOUNG, and JOHN S. TOMBERLIN colluded during the years of the conspiracy

in a pervasive scheme to steal money by looting the accounts of EFI and falsifying EFI's books.

The defendants perpetrated this fraud by making EFI appear more profitable than it actually was

and making it appear that EFI was exposed to less risk than it actually was, thereby keeping their

jobs, "earning" increasingly higher salaries and bonuses, and continuing to obtain funding for EFI from BLC and its other creditors. They also submitted bogus loan documents and insurance invoices that concealed the fact that the defendants were stealing EFI's funds, and that helped to make EFI look like it was doing legitimate business when it was not. Due to the long-term, sophisticated nature of this scheme, and the fact that people in many different roles were willing to participate, EFI and its owners, Sterling and BLC, suffered losses totaling approximately $53 million.

     35. Defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER led and oversaw the fraudulent scheme at EFI. Defendants BRAAS and SCHLAGER, with the assistance of defendants MARY C. STANKIEWICZ, MISTY L. KROESEN, CURTIS A. KROESEN, JOHN WILEY SPANN, and JOHN S. TOMBERLIN, inflated EFI's appearance of profitability by creating numerous bogus loans. These bogus loans included loans that:

    (a)    were in the names of fictitious borrowers,

    (b)    were in the names of borrowers who did not know about the loans and did not purchase the equipment listed,

    (c)    were in the names of borrowers who did not do business with EFI,

    (d)    were in the names of businesses that had previously been shut down,

    (e)    were in the names of deceased borrowers,

    (f)    were in the names of borrowers who were not loggers,

    (g)    were issued under alias borrower names in order to circumvent EFI's loan limit reporting policy,

    (h)    listed down payments that had never been made, and

(i)     were in the names of straw or nominal borrowers, that is, people who had been recruited and sometimes paid money to falsely sign EFI loan documents claiming to be loggers purchasing logging equipment.

36.     Defendant JOHN WILEY SPANN helped defendant MICHAEL J. SCHLAGER initiate hundreds of loans at EFI between January 2001 and April 2007. Approximately 85% of the loans that defendant JOHN WILEY SPANN helped originate were bogus loans.

37.     Defendant JOHN WILEY SPANN assisted the scheme by recruiting and paying nominal borrowers who signed false EFI loan paperwork and provided their personal identifying information, sometimes in exchange for payment.  For performing this service, as well as others, defendant SPANN paid himself a "salary" from EFI and used EFI money to pay debts he owed to others.

38.     In order to give the appearance of legitimacy to the bogus loans, defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER, assisted by defendants MARY C. STANKIEWICZ, MISTY L. KROESEN, CURTIS A. KROESEN, JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN, filled EFI's files with false records and records designed to give a false impression of legitimacy, such as documents with forged borrower and dealer signatures, documents that listed down payments as having been paid when they were not, loan contracts that listed equipment that already secured one loan as the collateral on a separate loan, documents falsely purporting to show that equipment was insured, unfiled UCC forms that were placed in the files to give the false impression that they had been properly filed, and bogus insurance premium invoices.

39.     In order to minimize the number of third parties who knew about the creation of the bogus loans, defendants JOSEPH M. BRAAS and CURTIS A. KROESEN sometimes instructed other EFI employees not to order customer payment coupon books and not to send "paid off" letters to customers whose loans were recorded in EFI's records as having been paid in full.

40.     In order to boost the appearance of EFI's income and profitability, defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER directed MARY C. STANKIEWICZ and MISTY L. KROESEN not to issue the usual proceeds checks to dealers when bogus loans were funded, but instead to credit the proceeds of the bogus loans to EFI's income account, and to record the proceeds of the bogus loans as customer payments on other, unrelated loans.

41.     Defendant JOSEPH M. BRAAS issued loans under borrower aliases and, with the assistance of defendant CURTIS A. KROESEN, altered EFI's records to show borrower aliases, all in order to circumvent the EFI reporting requirement for borrowers who exceeded $500,000 in loans and to conceal the extent of risk to which EFI was exposed by the defendants.

42.     Defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER, with the assistance of defendants MARY C. STANKIEWICZ, MISTY L. KROESEN, JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN, raided EFI's insurance escrow account and used that money to pay defendants SPANN, YOUNG, and TOMBERLIN; to pay nominal borrowers; and to cycle money back to EFI so that they could use it to conceal delinquent loans.

43.     In order to avoid having to write loans off as losses or report them in EFI's

books as delinquencies, defendant JOSEPH M. BRAAS issued deferrals on loans without contacting the borrower or charging the customary deferral fee.

44.     Defendant JOSEPH M. BRAAS diverted customer payments and directed that they be applied as payments on other, unrelated loans, in order to conceal the delinquent status of those loans.

45.     Defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER inflated the appearance of EFI's profitability by failing to report repossessions.  Defendants BRAAS and SCHLAGER carried loan files on EFI's books after the equipment securing the loan had been repossessed, and they concealed the delinquent status of these loans by issuing improper deferrals.

46.     Defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER, with the assistance of defendants MARY C. STANKIEWICZ, MISTY L. KROESEN, CURTIS A. KROESEN, and JOHN WILEY SPANN, undermined the audit process in order to conceal the true financial status of EFI.  The defendants did so by submitting to the auditors false and misleading records, such as back-dated, whited-out, and altered documents, and interfering with the loan confirmation process.  The defendants knowingly provided incorrect addresses for auditor confirmation letters, so that the letters would either be returned undeliverable or not returned at all.  Defendant SCHLAGER also bundled confirmation letters and had them forwarded to defendant SPANN, who forged the borrower signatures and paid people in exchange for their signatures.

**OVERT ACTS**

In furtherance of the conspiracy and to accomplish its objects, defendants JOSEPH M. BRAAS, MICHAEL J. SCHLAGER, MARY C. STANKIEWICZ, MISTY L. KROESEN, CURTIS A. KROESEN, JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN, and others known and unknown to the grand jury, committed the following overt acts in the Eastern District of Pennsylvania, and elsewhere:

1.      From in or about March 2002, to in or about April 2007, the EFI reports that defendants JOSEPH M. BRAAS and MICHAEL J. SCHLAGER provided to BLC and Sterling executives on a monthly and quarterly basis, as well as statements defendants BRAAS ans SCHLAGER made at the meetings with BLC and Sterling management, included false information about, among other things, the number of new contracts purchased, EFI's income, and EFI's delinquent accounts.

2.      In or about 2002, defendants JOSEPH M. BRAAS and CURTIS A. KROESEN changed the names of borrowers on some existing loans to other names in order to avoid having to report borrowers who exceeded $500,000 in loans.  For his assistance with this task, defendant BRAAS paid defendant CURTIS A. KROESEN $300 cash.

3.      From in or about 2002 through in or about April 2007, defendant MISTY L. KROESEN, at the direction of JOSEPH M. BRAAS, falsely recorded the proceeds of bogus loans in EFI's books as customer payments on other loans.

4.      From in or about 2002 through in or about April 2007, defendant MISTY L. KROESEN, at the direction of JOSEPH M. BRAAS, changed customer addresses in EFI's computer system so that auditor confirmation letters would not be properly delivered.  In

14

exchange for her assistance with this project, defendant BRAAS paid defendant MISTY L. KROESEN $1,000.

5.      In or about September 2003, defendants JOSEPH M. BRAAS and MARY C. STANKIEWICZ originated a bogus loan for approximately $42,000 for a borrower with the purported name "Knot Wood Products, LLC."  In fact, this loan was for defendant STANKIEWICZ'S then-boyfriend, T.P., and was not for any purpose related to the purchase of logging equipment.  Defendant STANKIEWICZ delivered the proceeds check to T.P., and he, in turn, gave her $2,500.

6.      In or about May 2006, defendant JOSEPH M. BRAAS forwarded a memo to a borrower whose initials are D.C. in which defendant BRAAS stated that D.C. should forward money owed to EFI to defendant BRAAS because defendant BRAAS had made loan payments for D.C.  In fact, defendant BRAAS had not made these payments out of his personal accounts.  In response to defendant BRAAS'S memo, from in or about June 2006, to in or about November 2006, D.C. mailed defendant BRAAS five checks totaling $73,861.06, which defendant BRAAS deposited into his personal bank accounts.

7.      In or about January 2007, defendants JOSEPH M. BRAAS and CURTIS A. KROESEN originated a bogus loan, contract number 21163, in the name of borrower D.C. Defendants BRAAS and KROESEN caused an EFI check in the amount of $65,107.08 to be mailed to D.C. in Trenton, North Carolina.  Included with the check was a handwritten note from defendant BRAAS which asked D.C. to return the $65,107.08 to him in two checks.  In response to the note from defendant BRAAS, in or about January 2007, D.C. mailed defendant BRAAS two checks, which defendant BRAAS deposited into his personal bank accounts.

15

8.      In or about March 2004, defendants JOSEPH M. BRAAS and CURTIS A. KROESEN originated a bogus loan, contract number 18436, in the name of D.C.  In or about April 2004, defendants BRAAS and KROESEN caused D.C. to receive a letter from EFI confirming the purchase of the contract, and a copy of the fraudulent Conditional Sales Contract.

9.      In or about May 2006, defendant JOSEPH M. BRAAS originated a bogus loan, contract number 20547, that was recorded under the borrower alias "C.T.T., I." but was actually for D.C.  In or about that same month, D.C. received from EFI a letter that had been sent to him via the United States Postal Service from Lititz, Pennsylvania, to Trenton, North Carolina, confirming the purchase of the contract, and a copy of the fraudulent Conditional Sales Contract.

10.      In or about October 2006, defendant JOSEPH M. BRAAS originated a bogus loan, contract number 20876, in the name of borrower D.C.  In or about the same month, D.C. received from EFI a letter that had been sent to him via the United States Postal Service from Lititz, Pennsylvania, to Trenton, North Carolina, confirming the purchase of the contract, and a copy of the fraudulent Conditional Sales Contract.

11.      From in or about May 2006 through in or about March 2007, defendant JOSEPH M. BRAAS recruited defendant CURTIS A. KROESEN to assist him with placing falsified records into loan files in anticipation of an upcoming audit by E&Y.  These records included back-dated credit reports, falsified work and bank references, and falsified account analyses and reviews.

12.      In or about March 2007, defendant MISTY L. KROESEN, at the direction of JOSEPH M. BRAAS, created a false record showing that a customer had approximately $4,000 more in his account than he actually did, so that defendant BRAAS could present the

16

false record to E&Y auditors.

13.     In or about March 2007, E&Y auditors requested documentation of some specific customer payments that did not exist because the payments were made using the proceeds of bogus loans.  Defendants MARY C. STANKIEWICZ and MISTY L. KROESEN, at the direction of JOSEPH M. BRAAS and MICHAEL J. SCHLAGER, created false records of approximately five "check-by-phone" payments, and defendant SCHLAGER back-dated them.  Defendant STANKIEWICZ then faxed the bogus documents to E&Y.  For their assistance, defendant BRAAS paid defendants STANKIEWICZ and MISTY L. KROESEN $1,000 each.

14.     From in or about January 2001 to in or about April 2007, defendant JOHN WILEY SPANN took approximately $80,000 to $100,000 per year from EFI as "compensation" for helping to orchestrate the EFI loan fraud scheme.

15.     From in or about January 2001 through in or about April 2007, defendant JOHN WILEY SPANN paid approximately $2 million to people in exchange for their assistance in creating bogus loans, which included signing bogus loan contracts and auditor confirmation letters.  These payments were funded with the proceeds of bogus loans.

16.     In or about May 2001, defendant JOHN WILEY SPANN recruited defendant JOHN S. TOMBERLIN to sign EFI loan paperwork that listed defendant TOMBERLIN as the purported borrower for a loan in the amount of approximately $124,000.  In truth and in fact, defendant SPANN paid defendant TOMBERLIN approximately $10,000 to sign the false EFI loan documents claiming that defendant TOMBERLIN purchased logging equipment that defendant TOMBERLIN did not purchase.

17.     In or about February 2005, defendant JOHN WILEY SPANN recruited an

individual whose initials are V.P. to sign false EFI loan documents in exchange for payments. V.P. signed the false EFI loan contract and associated papers falsely indicating that he had made a down payment of $31,000 and that he was purchasing logging equipment from an individual whose initials were J.B.S.  On or about March 3, 2005, V.P. received from EFI a letter that had been mailed to him via U.S. Mail from Lititz, Pennsylvania, to Andalusia, Alabama, confirming the purchase of his contract, and a copy of the fraudulent Conditional Sales Contract.  Thereafter, defendant SPANN paid V.P. several thousand dollars for signing the bogus EFI loan documents.

18.     From in or about January 2001 through in or about April 2007, defendant JOHN WILEY SPANN forged numerous signatures on bogus EFI loan documents.

19.     In or about 2005, defendant MICHAEL J. SCHLAGER sent JOHN WILEY SPANN numerous E&Y loan confirmation letters that were addressed to the purported borrowers listed on several bogus loans.  At defendant SCHLAGER'S direction, defendant SPANN had the letters signed by the nominal borrowers and then mailed them back from the purported borrower's home towns.  Defendant SPANN paid several thousand dollars to obtain these signatures on the false documents.

20.     In or about 2005, defendant MICHAEL J. SCHLAGER directed JOHN WILEY SPANN to forge borrower signatures on two E&Y loan confirmation letters.  After forging the signatures, defendant SPANN then drove from Alabama to Florida and Georgia, to mail the confirmation letters back so that the envelopes would have a postage mark from the purported borrowers' home towns.

21.     In or about 2005, defendant MICHAEL J. SCHLAGER directed defendant JOHN WILEY SPANN to contact certain nominal borrowers because auditors were going to call

18

them, and defendant SCHLAGER wanted defendant SPANN to coach the individuals on what to

say if they received a call from an auditor.  Defendant SPANN contacted two such nominal

borrowers.  Defendant SPANN also paid the two individuals several thousand dollars to lie if

contacted by an auditor.

        22.     From in or about January 2001 through in or about April 2007, defendant

JOHN WILEY SPANN provided bogus SCA insurance documents, referred to as insurance

"binders," to defendant MICHAEL J. SCHLAGER that purported to show that nominal

borrowers had insured the equipment that secured their loans through SCA.  In fact, no EFI

borrower had purchased insurance from SCA for equipment that secured an EFI loan.

        23.     From in or about December 2002 through in or about January 2007, at the

suggestion of defendant MICHAEL J. SCHLAGER, defendant JOHN WILEY SPANN recruited

defendants HAROLD W. YOUNG and JOHN S. TOMBERLIN to help him raid EFI's insurance

escrow account of over $1 million.  At the end of each month, defendant SCHLAGER directed

defendant MARY C. STANKIEWICZ to prepare a list of accounts on which SCA was the

purported insurer.  Defendant SCHLAGER provided that list to defendant SPANN.  Defendant

SPANN, with the permission of defendants YOUNG and TOMBERLIN, then directed SCA

employees to prepare false SCA invoices in the names of the purported borrowers on the list

provided by defendant SCHLAGER.  The SCA employees or defendant SPANN then faxed the

false invoices from Andalusia, Alabama, to EFI in Lititz, Pennsylvania.  Defendant SCHLAGER

directed that the bills be paid, so then defendant MISTY L. KROESEN issued checks payable to

SCA and had them mailed to SCA.

        24.     Defendants HAROLD W. YOUNG and JOHN S. TOMBERLIN kept a

total of approximately 20% of the funds that were deposited into their accounts from EFI, and

defendant YOUNG wrote checks for the remainder of the funds as directed by defendant JOHN

WILEY SPANN.

        25.    Some of the funds defendant JOHN WILEY SPANN received from the

SCA accounts he cycled back to EFI so that defendant MICHAEL J. SCHLAGER could use

them to conceal delinquent loans, some he kept for himself and used to pay his personal debts,

and some defendant SPANN used to pay nominal borrowers.

        In or about the following months, defendants JOHN WILEY SPANN, HAROLD

W. YOUNG, and JOHN S. TOMBERLIN caused false SCA invoices in the following amounts

to be submitted to EFI:

| OVERT ACT | DATE | AMOUNT |
|:---:|:---:|:---:|
| 26. | January 2003 | $14,400.00 |
| 27. | January 2003 | $24,000.00 |
| 28. | January 2003 | $11,000.00 |
| 29. | January 2003 | $24,000.00 |
| 30. | December 2003 | $65,040.00 |
| 31. | January 2004 | $58,770.00 |
| 32. | January 2004 | $67,048.00 |
| 33. | February 2004 | $72,134.67 |
| 34. | July 2004 | $40,580.25 |
| 35. | August 2004 | $32,100.00 |
| 36. | August 2004 | $25,100.00 |
| 37. | September 2004 | $25,900.00 |
| 38. | October 2004 | $32,800.00 |

| OVERT ACT | DATE | AMOUNT |
|---|---|---|
| 39. | December 2004 | $44,180.00 |
| 40. | April 2005 | $51,240.00 |
| 41. | June 2005 | $51,880.00 |
| 42. | August 2005 | $40,975.00 |
| 43. | September 2005 | $25,000.00 |
| 44. | September 2005 | $37,990.00 |
| 45. | November 2005 | $46,670.00 |
| 46. | March 2006 | $34,400.00 |
| 47. | May 2006 | $49,965.00 |
| 48. | August 2006 | $51,790.00 |
| 49. | September 2006 | $48,340.00 |
| 50. | December 2006 | $66,150.00 |

In or about the following months, defendants MICHAEL J. SCHLAGER, MARY C. STANKIEWICZ, MISTY L. KROESEN, JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN caused checks in the following amounts to be written from EFI to SCA as payment on the false SCA invoices:

| OVERT ACT | DATE | AMOUNT |
|---|---|---|
| 51. | January 2003 | $38,400.00 |
| 52. | January 2003 | $35,000.00 |
| 53. | December 2003 | $65,040.00 |
| 54. | February 2004 | $125,818.00 |
| 55. | February 2004 | $72,134.67 |
| 56. | July 2004 | $40,580.25 |
| 57. | August 2004 | $32,100.00 |

| OVERT ACT | DATE | AMOUNT |
|:---:|:---:|:---:|
| 58. | August 2004 | $25,100.00 |
| 59. | September 2004 | $25,900.00 |
| 60. | October 2004 | $32,800.00 |
| 61. | December 2004 | $44,180.00 |
| 62. | April 2005 | $51,240.00 |
| 63. | June 2005 | $51,880.00 |
| 64. | August 2005 | $40,975.00 |
| 65. | September 2005 | $25,000.00 |
| 66. | September 2005 | $37,990.00 |
| 67. | November 2005 | $46,670.00 |
| 68. | April 2006 | $34,400.00 |
| 69. | May 2006 | $49,965.00 |
| 70. | August 2006 | $51,790.00 |
| 71. | September 2006 | $48,340.00 |
| 72. | December 2006 | $66,150.00 |

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 32 and 34 through 46, and Overt Acts 1 through 72 of Count One are incorporated here.

### THE SCHEME

2.     From at least in or about January 2001, to in or about April 2007, defendants

**JOSEPH M. BRAAS,**
**MICHAEL J. SCHLAGER,**
**MISTY L. KROESEN,**
**CURTIS A. KROESEN,**
**JOHN WILEY SPANN,**
**HAROLD W. YOUNG, and**
**JOHN S. TOMBERLIN**

devised and intended to devise a scheme to defraud EFI and others, and to obtain money and property from EFI and others, by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

It was part of the scheme that:

3.     Defendants JOSEPH M. BRAAS, MICHAEL J. SCHLAGER, MARY C. STANKIEWICZ, MISTY L. KROESEN, CURTIS A. KROESEN, JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN colluded during the years of the conspiracy in a pervasive scheme to steal money by looting the accounts of EFI and falsifying EFI's books. The defendants perpetrated this fraud by making EFI appear more profitable than it actually was and making it appear that EFI was exposed to less risk than it actually was, thereby keeping their

23

jobs, "earning" increasingly higher salaries and bonuses, and continuing to obtain funding for

EFI from BLC and its other creditors.  They also submitted bogus loan documents and insurance

invoices that concealed the fact that the defendants were stealing EFI's funds, and that helped to

make EFI look like it was doing legitimate business when it was not.  Due to the long-term,

sophisticated nature of this scheme, and the fact that people in many different roles were willing

to participate, EFI and its owners, Sterling and BLC, suffered losses totaling approximately

$53 million.

      4.      On or about the following dates, in Lancaster County, Pennsylvania, in the

Eastern District of Pennsylvania, and elsewhere, defendants

**JOSEPH M. BRAAS,**
**MICHAEL J. SCHLAGER,**
**MISTY L. KROESEN,**
**CURTIS A. KROESEN,**
**JOHN WILEY SPANN,**
**HAROLD W. YOUNG, and**
**JOHN S. TOMBERLIN,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, knowingly caused to be delivered by the mail carrier indicated below,

according to the directions thereon, the items described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 2 | January 30, 2003 | EFI check number 10071, in the amount of $35,000.00, mailed via Federal Express from EFI in Lititz, Pennsylvania, to SCA in Andalusia, Alabama |
| 3 | January 30, 2004 | EFI check number 11164, in the amount of $125,818.00, mailed via Federal Express from EFI in Lititz, Pennsylvania, to SCA in Andalusia, Alabama |

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 4 | February 26, 2004 | EFI check number 11231, in the amount of $72,134.67, mailed via Federal Express from EFI in Lititz, Pennsylvania, to SCA in Andalusia, Alabama |
| 5 | April 8, 2004 | Letter from EFI in Lititz, Pennsylvania, to D.C. in Trenton, North Carolina, mailed via the United States Postal Service, confirming the purchase of D.C.'s bogus contract, EFI contract number 18436, and a copy of the fraudulent Conditional Sales Contract |
| 6 | August 6, 2004 | EFI check number 11589, in the amount of $32,100.00, mailed via Federal Express from EFI in Lititz, Pennsylvania, to SCA in Andalusia, Alabama |
| 7 | March 3, 2005 | Letter from EFI in Lititz, Pennsylvania, to V.P. in Andalusia, Alabama, mailed via the United States Postal Service, confirming the purchase of V.P.'s bogus contract, EFI contract number 19352, and a copy of the fraudulent Conditional Sales Contract |
| 8 | May 24, 2006 | Letter from EFI in Lititz, Pennsylvania, to D.C. in Trenton, North Carolina, mailed via the United States Postal Service, confirming the purchase of D.C.'s bogus contract, EFI contract number 20547, and a copy of the fraudulent Conditional Sales Contract |
| 9 | October 11, 2006 | Letter from EFI in Lititz, Pennsylvania, to D.C. in Trenton, North Carolina, mailed via the United States Postal Service, confirming the purchase of D.C.'s bogus contract, EFI contract number 20876, and a copy of the fraudulent Conditional Sales Contract |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       Paragraphs 1 through 32 and 34 through 46, and Overt Acts 1 through 72 of Count One are incorporated here.

### The Conspiracy

2.       From in or about December 2002 through in or about January 2007, in Lancaster County, Pennsylvania, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN WILEY SPANN
HAROLD W. YOUNG, and
JOHN S. TOMBERLIN**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit an offense against the United States, that is, to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1957.

### MANNER AND MEANS

It was part of the conspiracy that:

3.       Defendants JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN worked together during the years of the conspiracy to steal money from EFI in Lititz, Pennsylvania, and then to divide that money among themselves and others.

4.       Defendants JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN

26

S. TOMBERLIN caused false SCA invoices to be submitted to EFI.

        5.     As a result of the false SCA invoices submitted to EFI, defendants JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN caused EFI to mail to SCA checks totaling over $1 million that was not owed to SCA.

        6.     After SCA received the stolen money from EFI, on or about the following dates defendants JOHN WILEY SPANN, HAROLD W. YOUNG, and JOHN S. TOMBERLIN caused the following monetary transactions in the criminally derived property to occur:

| DATE | DESCRIPTION |
|------|-------------|
| 1/10/2003 | SCA check number 2304 from The Bank for $14,400.00, written to a payee whose initials are T.C. |
| 1/10/2003 | SCA check number 2305 from The Bank for $17,160.00, written to defendant JOHN WILEY SPANN |
| 1/31/2003 | SCA check number 2346 from The Bank for $30,500.00, written to defendant JOHN WILEY SPANN |
| 12/12/2003 | SCA check number 2773 from The Bank for $37,390.00, written to Forestry Equipment Products |
| 12/16/2003 | SCA check number 2775 from The Bank for $17,500.00, written to defendant HAROLD W. YOUNG |
| 2/2/2004 | SCA check number 2832 from The Bank for $97,985.00, written to Forestry Equipment |
| 2/2/2004 | SCA check number 2833 from The Bank for $12,831.00, written to defendant JOHN S. TOMBERLIN |
| 2/2/2004 | SCA check number 2834 from The Bank for $12,831.00, written to defendant HAROLD W. YOUNG |
| 2/26/2004 | SCA check number 3805 from Colonial Bank for $11,938.67, written to Forest Equipment and Products |
| 3/4/2004 | SCA check number 3807 from Colonial Bank for $30,000.00, written to defendant HAROLD W. YOUNG |

| DATE | DESCRIPTION |
|---|---|
| 3/4/2004 | SCA check number 3808 from Colonial Bank for $22,034.00, written to defendant HAROLD W. YOUNG |
| 7/13/2004 | SCA check number 3911 from Colonial Bank for $22,328.20, written to Forestry Equipment |
| 8/9/2004 | SCA check number 3937 from Colonial Bank for $25,680.00, written to Forestry Equipment |
| 8/18/2004 | SCA check number 3946 from Colonial Bank for $20,080.00, written to Forestry Equipment |
| 10/1/2004 | SCA check number 4000 from Colonial Bank for $14,520.00, written to Forestry Equipment |
| 10/20/2004 | SCA check number 4022 from Colonial Bank for $18,240.00, written to Forestry Equipment |
| 1/3/2005 | SCA check number 4103 from Colonial Bank for $35,344.00, written to a payee with the initials J.B.S. |
| 4/20/2005 | SCA check number 4323 from Colonial Bank for $14,000.00, written to a payee with the initials T.N. |
| 8/26/2005 | SCA check number 4537 from Colonial Bank for $13,000.00, written to Point A. Timber |
| 11/4/2005 | SCA check number 4667 from Colonial Bank for $25,000.00, written to a payee with the initials R.&L.R. |
| 4/4/2006 | SCA check number 3393 from Southtrust Bank for $27,520.00, written to Point A. Logging & Timber |
| 6/1/2006 | SCA check number 1 from Regions Bank for $39,972.00, written to Point A. Logging & Timber |
| 8/8/2006 | SCA check number 1023 from Regions Bank for $23,092.15, written to Regions Bank |
| 10/2/2006 | SCA check number 1039 from Regions Bank for $20,240.41, written to Regions Bank |
| 1/2/2007 | SCA check number 1076 from Regions Bank for $42,920.00, written to Point A. Timber |

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS ELEVEN THROUGH FIFTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    Paragraphs 1 through 32 and 34 through 46, and Overt Acts 1 through 72 of Count One are incorporated here.

      2.    On or about the dates set forth below, in Lancaster County, Pennsylvania, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN WILEY SPANN,**
**HAROLD W. YOUNG, and**
**JOHN S. TOMBERLIN**

knowingly engaged in, and aided and abetted and willfully caused, monetary transactions affecting interstate commerce with criminally derived property of a value greater than $10,000, described more fully below, such property being derived from a specified unlawful activity, that is mail fraud, in violation of Title 18, United States Code, Section 1341:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 11 | 4/4/2006 | SCA check number 3393 from Southtrust Bank for $27,520.00, written to Point A. Logging & Timber |
| 12 | 6/1/2006 | SCA check number 1 from Regions Bank for $39,972.00, written to Point A. Logging & Timber |
| 13 | 8/8/2006 | SCA check number 1023 from Regions Bank for $23,092.15, written to Regions Bank |
| 14 | 10/2/2006 | SCA check number 1039 from Regions Bank for $20,240.41, written to Regions Bank |
| 15 | 1/2/2007 | SCA check number 1076 from Regions Bank for $42,920.00, written to Point A. Timber |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## <u>NOTICE OF FORFEITURE #1</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

    1.    As a result of the violations of Title 18, United States Code, Sections 371

and 1341, affecting a financial institution, set forth in this indictment, defendants

**JOSEPH M. BRAAS,
MICHAEL J. SCHLAGER,
MISTY L. KROESEN,
CURTIS A. KROESEN,
JOHN WILEY SPANN,
HAROLD W. YOUNG, and
JOHN S. TOMBERLIN**

shall forfeit to the United States of America any property that constitutes, or is derived from,

proceeds traceable to the commission of such offenses, as charged in this indictment, including,

but not limited to, the sum of $53,000,000.00.

    2.    If any of the property subject to forfeiture, as a result of any act or

omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided

        without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Sections 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property subject to forfeiture.

    All pursuant to Title 18, United States Code, Section 982(a)(2).

30

## <u>NOTICE OF FORFEITURE #2</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section

1957, set forth in this indictment, defendants

**JOHN WILEY SPANN,**
**HAROLD W. YOUNG, and**
**JOHN S. TOMBERLIN**

shall forfeit to the United States of America any and all property involved in such offenses, and

any property traceable to such property, including, but not limited to, the sum of $1,041,452.92.

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendants:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b),

31

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(1).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

_____
**ZANE D. MEMEGER**
**UNITED STATES ATTORNEY**